[No. 2834-2. Division Two. December 27, 1978.]

SEATTLE–FIRST NATIONAL BANK, *as Executor, Respondent,* v. DOUGLAS TINGLEY, *Appellant.*

*Stephen J. Bean* and *Bean, Gentry & Rathbone,* for appellant.

*Arthur L. Davies* and *Owens, Weaver, Davies & Dominick,* for respondent.

REED, A.C.J.—Defendant Douglas Tingley appeals from a judgment on the pleadings in favor of plaintiff Seattle–First National Bank. The question is whether Tingley's father intended to bequeath to Tingley a number of valuable coins and a house. We agree with the trial judge there was no such testamentary intent and affirm the judgment.

Defendant's father, Raymond Tingley, died in 1975. He had executed two wills, one in 1970 and a second one in 1974. The 1970 will gave the defendant,

> my home at Boston Harbor, together with all the furnishings and personal effects located therein, *but if my son should predecease me, then the home, furnishings and personal effects at Boston Harbor are to be added to the residue of my estate.*

(Italics ours.)

The 1974 will had a more restrictive dispositive scheme, which provided that all property, except for certain personal effects, passed into a spendthrift trust for the benefit of defendant during his lifetime. It provided specifically that the son was to receive the father's

> furnishings and *personal effects* except the electric range, refrigerator–freezer, hot water heater and the Franklin stove that is located in the basement *at my home in Boston Harbor. But if my son should predecease me, then the home, furnishings and personal effects at Boston Harbor are to be added to the residue of my estate.*

(Italics ours.)

Neither will mentions that the father had four safety deposit boxes filled with bagged and loose gold and silver coins worth about $45,000. After the father's death the defendant, without authorization, removed the coins and sold some of them for about $20,000. Seeking to recover the proceeds from the sale, the executor bank successfully argued to the trial court that the coins were a part of the residuary estate under the 1974 will. The defendant son, however, maintained the coins passed to him as part of the "personal effects" granted to him under the will. Additionally, the defendant counterclaimed that the anti–lapse clause in the 1974 will gave him the Boston Harbor house as a gift by implication. The bank answered, and the trial court agreed, that the 1974 anti–lapse clause was the result of a mistake in drafting the will. We will first determine the father's testamentary intent regarding the coins.

## COINS

■ Early courts broadly construed the term "personal effects," to include all of a testator's personal estate, see Annot., 30 A.L.R.3d 797, 811–12 (1970), and cases cited therein. More recently courts have used the ejusdem generis rule to limit the personal effects to things of the same class as those enumerated in the text of the will—generally articles worn or associated with the person. Annot., 30 A.L.R. 3d, *supra;* see also *In re Estate of Johnson,* 5 Cal. App. 3d 173, 84 Cal. Rptr. 914, 918 (1970); *In re Estate of Donovan,* 169 Mont. 278, 546 P.2d 512, 514–15 (1976); *In re Estate of Reitz,* 213 Kan. 534, 516 P.2d 909, 911 (1973); 80 Am. Jur. 2d *Wills* §§ 1254–55 (1975); 28 C.J.S. *Effect* p. 837–38 (1941); Black's Law Dictionary 1301 (4th ed. rev. 1968).

■■ The 1974 will does not specifically define "personal effects" or otherwise limit the term to items worn by or associated with the person; but neither does the will expand the term to include four safety deposit boxes loaded with bags of gold and silver coins. In ascertaining the father's testamentary intent, we must construe specific terms and provisions in light of the entire will, as well as in light of the extrinsic facts, where necessary. *In re Estate of Riemcke,* 80 Wn.2d 722, 728–29, 497 P.2d 1319 (1972); *In re Estate of Griffen,* 86 Wn.2d 223, 226, 543 P.2d 245 (1975). Nothing in the record suggests the father intended to categorize his small fortune in coins as a "personal effect," and no definition we have found can be stretched to fit an asset of such magnitude.[1] The coins constitute almost one–third of the estate's total value. They were hidden away in safety deposit boxes and were kept neither for display nor for any sentimental value as heirlooms. The evidence shows the father bought and sold the bags of coins at prevailing prices on the precious metals market much as he would shares of stock. The hoard of coins was an investment security, kept

---

[1] Tingley cites two New York lower court cases in which coin collections were held to be personal effects. *In re Estate of Gault,* 48 N.Y.S.2d 928 (Sur. Ct. 1944);

as a hedge against inflation. It would strain language to label it a hobbyist's coin collection.

In addition, the evidence makes it unlikely the father would leave the coins outright to the son. According to the attorney who drafted the 1970 and 1974 wills, the father believed the son was a spendthrift. The restrictive dispositive scheme of the 1974 will reflects the father's belief. Although the 1970 will gives the son a house and a substantial sum of money, the 1974 will, by contrast, puts all property except for the personal effects into a spendthrift lifetime trust for the son. Further, although the 1970 will gives the son the contents of a safety deposit box (unconnected with this lawsuit), the 1974 will makes no mention of any safety deposit box; such a conspicuous omission appears to be intentional.

Because of the extraordinary value of the coins, the fact they were traded as investment units, the restrictive dispositive scheme of the 1974 will, and the absence of relevant donative language in the will, we find it unreasonable and unlikely the father would intend to give such a highly valuable liquid asset to his son, the very person he was fearful would squander his estate. A much more plausible interpretation is that Raymond Tingley never intended the coins to be a personal effect under his will; we therefore conclude that he intended to place his coins into the spendthrift trust, both to benefit his son and to protect his estate.

## HOUSE

The son argues in his counterclaim that his father intended to leave him the Boston Harbor house as a gift by implication. He reasons that a literal interpretation of the anti–lapse clause would put the house into a residuary trust

---

*In re Minniss' Will*, 200 Misc. 353, 107 N.Y.S.2d 35 (1951). The coin collections in those cases, however, were of unspecified size or value, and thus provide no support for Tingley's assertion that coins worth $45,000 and filling four safety deposit boxes are merely a personal coin collection. Rather, as we will later note, the coins were apparently purchased in bulk for their precious metal content, and not because of their numismatic value.

*only* if he had predeceased his father, and that because he survived his father, the house goes to him by implication. The trial court disagreed. It accepted the executor bank's interpretation that the anti–lapse clause mistakenly was included in the 1974 will and that both the house and the fixtures actually were intended to be placed in the residuary trust. We agree with the bank and the trial court.

 Although we find no Washington case dealing with implied testamentary gifts, we note gifts by implication in wills generally are disfavored. They are not allowed on the basis of conjecture or mere silence in a will; the proponent must show that the testator had a manifest and plain intent to create the gift, but that he failed to express himself as distinctly as he should have. The showing of intent must be so strong that a contrary intent cannot be supposed to have existed in the testator's mind. *Gallagher v. O'Brien,* 158 S.W.2d 345, 347 (Tex. Civ. App. 1941); *Bond v. Moore,* 236 Ill. 576, 86 N.E. 386, 387 (1908); *In re Donges' Estate,* 103 Wis. 497, 79 N.W. 786, 787–88 (1899). *See also* 80 Am. Jur. 2d *Wills, supra* at § 1385, and cases cited therein. Additionally, an interpretation which makes a will clear and understandable is preferred to one which renders the instrument strained and unnatural. *In re Estate of Price,* 75 Wn.2d 884, 889–90, 454 P.2d 411 (1969).

We find the bank's drafting–mistake theory to be more clear and understandable than the son's interpretation, because the son has failed to establish that his father had a plain and manifest intent to create a gift by implication. The son's interpretation, for example, fails to explain why there is no specific bequest of the house in the 1974 will. The father, in 1974, easily could have repeated the 1970 will's specific bequest of the house to the son. The silence in his will suggests he wished to cancel the bequest to his son.

The son's interpretation also fails to explain why the 1974 will prevents the son from receiving the major furnishings and fixtures of the house. Douglas Tingley concedes the electric range, refrigerator–freezer, hot water

heater, and Franklin stove all pass to the residuary trust. It would make little sense for the father to have intended those fixtures to be torn from the house and sold alone for relatively little salvage value to help fund the testamentary trust. It would make even less sense for him to have intended to give the son a house stripped of most of its creature comforts in the way of furnishings and fixtures.

It is far more likely that the anti–lapse clause in the 1974 will is a drafting mistake and that the father actually intended the house to pass with the fixtures and the rest of the major assets into the residuary trust.[2] In fact, the will's restrictive dispositive scheme is internally consistent only if the disputed anti–lapse clause is left out. Such a deletion is logical in light of the other deletions the father made in writing his 1974 will, such as his removal of his son as executor, his removal of the bequest of the major fixtures of the house, and his removal of all mention of safety deposit boxes.[3] Additionally, the clauses' identical wording and placement in both the 1970 and 1974 wills strongly suggest the 1974 clause was left in by oversight of the drafting attorney.

In sum, the record falls far short of showing the father intended to leave either his carefully guarded coin investment or his house to a son he considered to be a spendthrift. We therefore hold that the father intended both his coins and house to pass into the residuary trust with the rest of his major assets.

---

[2]The drafting attorney died before the son raised this counterclaim and so was never questioned regarding the anti–lapse clause.

[3]The son argues such an interpretation of the 1974 will violates the rule that "where there is room for construction, that meaning will be adopted which favors those who would inherit under the intestate laws". *In re Estate of Levas*, 33 Wn.2d 530, 536, 206 P.2d 482 (1949). That rule is inapplicable to the son because during his lifetime he is the sole beneficiary under both the 1974 will and the trust.

Judgment affirmed.

SOULE, J., and JOHNSON, J. Pro Tem., concur.