IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Estate of: | ) | |
| | ) | No. 32192-4-III |
| BETTY L. LOWE, | ) | |
| | ) | |
| Deceased. | ) | PUBLISHED OPINION |
| | ) | |
| | ) | |
| | ) | |

LAWRENCE-BERREY, J. — Aaron Lowe sued, challenging his brother Lonnie

Lowe's right to numerous silver bars and bags of silver coins that the latter received from

their late mother, Betty Lowe. The trial court rejected Aaron's various legal challenges

and confirmed Lonnie's right to the silver bars and coins. The trial court additionally

ordered Aaron to pay Lonnie's and the estate's attorney fees.

Aaron raises numerous issues on appeal. We determine that substantial evidence

supports the trial court's findings and that Aaron is not entitled to the relief he seeks.

Although we affirm the trial court's award of attorney fees in favor of Lonnie and the

estate, we use our independent discretion and deny an award of fees on appeal.

FACTS

Donald Lowe and his wife Betty lived in Spokane and were married for approximately 60 years. Donald died on April 16, 2003. Donald's will left several specific bequests and left his residuary estate to "the Personal Representative as appointed in Article 5 of this will." Ex. P-31. Section 5.1 of Donald's will named Aaron as the first personal representative, Aaron's ex-wife as first alternate, and Lonnie as second alternate. Section 5.1 of Donald's will also provided, "Any successor Personal Representative shall have the same power as the original Personal Representative to designate a successor." Ex. P-31. Aaron, his ex-wife, and Lonnie each filed declinations to serve as personal representative, and Aaron filed an affidavit nominating his mother Betty to serve as personal representative. Sometime before he died, Donald also wrote a letter addressed to his three sons, stating:

> I just wanted to write down some of my thoughts about after I'm gone.
> I have asked Aaron to take responsibility in looking after your mother. It may be necessary to sell what ever [sic] he can to care for her. . . . After she is gone, I want everything else divided between you boys or sold and the money divided between you.
> My life was awfully short & I didn't do much.
> You are three of the finest boys anyone could have & I'm so proud of you. I hope you can get along with each other.

Ex. P-35. The copy of the quoted letter was faxed from Lonnie to his father's estate planning attorney, Robert Lamp, on August 18, 2003.

Betty filed a petition for probate of Donald's will on October 27, 2003, seeking appointment as administrator and an order that the estate be distributed pursuant to the laws of intestacy. The probate court granted Betty's request to be designated the administrator. Further, because Donald's will did not specifically name the residual beneficiary, the probate court granted Betty's request to probate her husband's estate pursuant to the laws of intestacy.

It is now necessary to provide some background information as context for later events. Donald collected silver bars and coins over the years. Sometime in the 1980s, Donald and a friend, Donald Poindexter, hid silver bars and coins in the flume of the former's fireplace in the basement of the family home. Additionally, Donald secreted coins in various hiding places throughout the family home. Lonnie and Aaron knew that most of the treasure was hidden in the flume of the fireplace in the basement. Soon after Donald died, Lonnie assisted his mom in recovering the treasure by disassembling the flume.

On September 15, 2003, and during the pendency of Donald's probate, Betty executed her own will. The will named Lonnie as personal representative. On the same date, Betty executed a general power of attorney in favor of Lonnie. Mr. Lamp prepared both documents. Betty's will directed that 80 percent of her estate be distributed equally among her three sons, and the remaining 20 percent be distributed equally among her grandchildren. Article II of the will stated, "If I leave a list of written instructions for

3

disposition of any of my tangible personal property, I direct that such property listed in those instructions be distributed to the persons named to receive such property in the written instructions." Ex. P-15.

On January 27, 2004, Betty filed an inventory and appraisement of Donald's estate. Donald's will did not disclose the treasure, and Betty similarly opted not to disclose it when she filed the inventory and appraisement. Donald's probate was completed without objection in early 2004.

Between 2004 and 2007, Lonnie, with Betty's consent, removed the silver bars and bags of silver coins from Betty's house and hid them in a locked safe on his property in Olympia. Lonnie never kept a written record of how many silver bars and bags of silver coins he transferred from Betty's home to his.

On September 3, 2007, Betty drafted written instructions for the distribution of the silver coins and bars. The instructions stated that Lonnie had discretion on how to divide the silver coins and bars. Betty attempted to give those instructions to Lonnie, but he referred her to Mr. Lamp. Mr. Lamp formalized the written instructions, and referring to the clause in Betty's will allowing for such instructions, left "to Lonnie O. Lowe any and all silver coins and bars to distribute as he shall determine or to retain for himself." Ex. P-14. On September 11, 2007, Betty signed the instructions prepared by Mr. Lamp. Lonnie was not present at the signing.

4

Betty died on October 1, 2011. Later that month, Lonnie filed a petition for an order admitting Betty's will to probate and for appointment as personal representative. Aaron initiated this action on February 22, 2012. In his initial and his later amended petitions, Aaron sought an order requiring Lonnie to account for all assets including the silver treasure and an order removing Lonnie as personal representative. Additionally, the petitions alleged numerous legal theories to support Aaron's requested relief of returning the silver treasure to Betty's estate so it could be distributed to her children and grandchildren in accordance with her will.

On August 23, 2013, less than a month before the start of trial, Aaron filed a motion seeking court permission to file a second amended and supplemental petition. This second amended and supplemental petition sought to add additional claims, including an argument that the assets in Donald's estate were distributed in error to Betty, that Lonnie should not inherit anything, and that all of the property removed by Lonnie be returned to the estate. Lonnie, both personally and as personal representative of his mother's estate, opposed that motion. The court denied the motion, and the matter proceeded to trial.

Trial occurred September 16-19, 2013. At trial, Mr. Lamp testified as to Betty's competency at the initial will conference, stating, "She seemed to be totally appropriate. She knew what her assets were. She didn't know the exact values. She knew her real estate." Report of Proceedings (RP) at 389. Mr. Lamp stated he did not have any

5

concerns about her competency at the initial conference, on the day she signed the will, or on the day she executed the written instructions regarding her tangible personal property.

Joni Marsh, a nurse practitioner who saw Betty for annual physicals and some medical issues from 2002 to 2011, also testified that Betty was alert, oriented, well groomed, and did not display any confusion during her visits. Ms. Marsh also testified, however, that a note from a neurologist in Betty's medical record indicated she had been tested for dementia in early 2011, and her results were consistent with moderate to severe dementia.

Testimony also revealed that Betty worked cleaning houses for most of her life, drove until the time of her death, cared for grandchildren two to three days per week, and lived independently in her own home. Lonnie stated that his mother started having some short-term memory loss the year she died. While Aaron testified generally that his mother had abused prescription pills and drank alcohol during the 1960s and 70s, he did not testify regarding her mental state when she executed the relevant documents. Aaron was not present when Betty signed her will or her written instructions for distribution of personal property.

Lonnie admitted that he removed silver bars and bags of silver coins from his mother's home on three to four occasions between 2004 and 2007 at his mother's direction and in her presence. One silver bar weighed approximately 1,000 ounces.

6

Betty directed that the bar be sold, and the proceeds were used for various expenses Betty incurred, including a new roof, other work on her house, and the purchase of an automobile. Lonnie admitted that he did not inventory or account for the silver his mother directed him to remove while she was living, nor did he keep track of what she directed him to sell or spend. He never had an appraisal made of any of the items he removed from the fireplace before her death. Aaron testified that up until her death, Betty would ask him for money, and he would give her $100 every time she asked for it.

Betty also gifted cash to Lonnie at various times, but he testified he did not exercise any powers under the power of attorney to obtain any of his mother's assets during her life. He did not gift himself any of her property, including proceeds from the sale of the silver, the silver itself, or money from her bank accounts for which he was a signatory. Lonnie testified that after his mother's death, in accordance with the written instructions and his nonintervention powers, he sold some of the silver coins and retained the money for himself. He inventoried the silver and other assets of the estate in the necessary pleadings in the probate, including the silver he had sold for himself.

After trial but before the court ruled, Aaron sought discretionary review with this court, which the commissioner of this court denied on October 17, 2013. The trial court issued a memorandum decision on December 16, 2013. The trial court also issued findings of fact and conclusions of law on May 30, 2014, denying all relief sought by Aaron. Additionally, the trial court ordered Aaron to pay for Lonnie's and the estate's

7

attorney fees. Finally, the trial court ordered Lonnie to file a formal appraisal of the

"coins, collectable currency, and any other items for which a formal appraisal has not

been obtained." Clerk's Papers (CP) at 326. The court entered a trial judgment on

May 30, 2014.

Aaron appeals, contending (1) the trial court abused its discretion in denying his

motion to file a second amended and supplemental petition, (2) the trial court erred in not

removing Lonnie as personal representative, (3) the trial court erred in finding that the

written instructions left by Betty properly distributed all of her silver to Lonnie, (4) the

trial court erred in finding that Lonnie had not improperly accepted or retained gifts

during his mother's lifetime under his power of attorney, (5) the court erred in finding

that Lonnie did not commit tortious interference with Aaron's right to an inheritance, and

(6) the trial court erred in awarding attorney fees to Lonnie.

## ANALYSIS

1.      *Whether the trial court abused its discretion in denying Aaron's motion to file a
        second amended and supplemental petition*

Aaron contends that the trial court erred when it denied his request to file his

second amended and supplemental petition. He argues that Lonnie and Mr. Lamp had

possession of the evidence that is the basis for the claims added in the second amended

and supplemental petition. He contends they refused to disclose this evidence until after

he filed his first amended petition. Because Lonnie had possession of this evidence,

8

Lonnie and the estate would not be prejudiced by the new claims. Lonnie and the estate argue the trial court did not abuse its discretion in denying leave to amend because Aaron's motion was untimely, unfairly prejudicial, and futile.

CR 15(a) allows a party to amend its pleading by leave of court and provides that "leave shall be freely given when justice so requires." CR 15(d) allows parties to file a motion to supplement the pleadings where events have occurred "since the date of the pleading sought to be supplemented" but contains no directive to the trial judge that leave to supplement be "freely given." As compared to amended pleadings, the purpose of supplementing the pleading is to "add facts occurring after the filing of the original complaint." *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 168, 736 P.2d 249 (1987).

The standard of review of a court's decision to deny leave to amend or supplement pleadings is abuse of discretion. *Id.* at 169. Abuse of discretion is discretion manifestly unreasonable or exercised on untenable grounds. *In re Marriage of Tahat*, 182 Wn. App. 655, 666, 334 P.3d 1131 (2014). In determining whether permitting amendment would cause prejudice, the trial court may consider factors including undue delay and unfair surprise. *Lane v. Skamania County*, 164 Wn. App. 490, 502, 265 P.3d 156 (2011). In addition to undue delay and unfair surprise, a court may consider whether an amendment is futile. *Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 142, 937 P.2d 154 (1997). "A lawsuit is futile where there is no evidence to support or prove existing or additional allegations and causes of action." *Nakata v. Blue Bird, Inc.*, 146 Wn. App. 267, 279, 191

9

P.3d 900 (2008). Finally, while not dispositive, the timing of the motion may result in prejudice. *Herron,* 108 Wn.2d at 166.

Here, Aaron filed his motion for a second amended and supplemental petition on August 23, 2013, and the case went to trial on September 16, 2013. This second amended and supplemental petition added claims that the assets in Donald's estate were distributed in error to Betty and should instead be traced and paid to the estate. It also added a claim that Lonnie financially abused his mother in violation of the abuse of vulnerable adults act, chapter 74.34 RCW, which would preclude any inheritance under the inheritance rights of slayers or abusers act, chapter 11.84 RCW. Because Aaron's motion did not seek to include transactions arising after the latest pleading, his motion actually was a motion to amend.

In their briefing before this court, the parties disagree whether the theories set forth in Aaron's second amended petition are meritorious. We see no need to address the merits. Where, as here, parties engage in discovery for a prolonged period and a motion to amend and supplement is brought less than one month before trial, a trial court properly exercises its discretion when it denies leave to amend and supplement with new theories that could have been raised months before.

2.      *Whether the trial court erred in not removing Lonnie as personal representative*

Aaron contends that the trial court erred by not removing Lonnie as personal representative where the evidence showed he breached his fiduciary duty to account by

10

selling $226,000 worth of coins without formal appraisal. He argues that even after being ordered by the court, Lonnie never obtained a formal verified appraisal of all the estate property he had. Lonnie and the estate respond that Aaron confuses Lonnie's obligations as personal representative of his mother's estate with Betty's use of her own funds prior to her death. Lonnie was Betty's fiduciary prior to her death as he had a power of attorney, but he did not have any obligation to control or account for her use of property while she was alive. Furthermore, evidence at trial established that after Betty's death, Lonnie maintained sufficient records of the estate and prepared an inventory and appraisement of the estate as required by statute.

The personal representative has the right to possess and control the estate's real and personal property until the estate is settled. *In re Estate of Jones*, 152 Wn.2d 1, 14, 93 P.3d 147 (2004). A personal representative granted nonintervention powers can administer the estate without further court orders. RCW 11.68.090(1). "If the personal representative 'has not faithfully discharged said trust or is subject to removal for any reason specified in [RCW] 11.28.250,' RCW 11.68.070 allows the court to intervene and remove or restrict the powers of a nonintervention personal representative." *Jones*, 152 Wn.2d at 9. RCW 11.28.250 provides:

> Whenever the court has reason to believe that any personal representative has wasted, embezzled, or mismanaged, or is about to waste, or embezzle the property of the estate committed to his or her charge, or has committed, or is about to commit a fraud upon the estate, or is incompetent to act, or is permanently removed from the state, or has wrongfully neglected the estate,

11

or has neglected to perform any acts as such personal representative, or for any other cause or reason which to the court appears necessary, it shall have power and authority, after notice and hearing to revoke such letters.

However, a trial court must have valid grounds supported by the record to remove a personal representative. *Jones*, 152 Wn.2d at 10. An appellate court will uphold challenged findings of fact that are supported by substantial evidence. *Id.* at 8. Substantial evidence is evidence "sufficient to persuade a rational, fair-minded person of the truth of the finding." *Id.*

Aaron relies on *Jones*, but *Jones* is distinguishable from this case. There, the personal representative was removed because the record established he was living in a house that belonged to the estate before the estate was closed; he failed to use the fair market value of the house in distribution; he failed to pay rent, utilities, or property taxes while living in the house; he commingled estate funds; and he refused to disclose financial information, including estate records, valuation of the estate, and information relating to estate property. 152 Wn.2d at 7, 21-22. Additionally, there was evidence that the executor commingled his personal funds with estate funds. *Id.* at 16. The court stated that while "[a]n executor should keep the trust funds in a bank account and not commingle them with his own money," doing so is not grounds for removal if all funds are thereafter accounted for. *Id.*

Here, Aaron made a number of accusations during his testimony at trial. Yet he failed to establish that there was any estate property unaccounted for or that Lonnie breached any of his duties as personal representative.

Lonnie testified that before Betty's death, he removed silver bars and bags of silver coins from her home on three to four occasions between 2004 and 2007 at her direction and in her presence. One silver bar weighed approximately 1,000 ounces. Betty directed that the bar be sold, and the proceeds were used for various expenses Betty incurred, including a new roof, other work on her house, and the purchase of an automobile. Lonnie stored the remaining silver in a safe at his residence in Olympia at his mother's direction. Lonnie did not inventory or account for the silver his mother directed him to remove while she was alive, nor did he keep track of what she directed him to sell or spend.

After his mother's death, Lonnie was appointed personal representative of Betty's estate and granted nonintervention powers. Exercising these nonintervention powers, Lonnie sold some of the silver coins and retained the money for himself in accordance with his mother's written instructions. The total value he received from these coins was $226,678.82. He deposited those funds into his personal account. Lonnie filed an initial inventory and appraisement on February 6, 2012, and filed an amended inventory and appraisement on September 24, 2012. In the first inventory and appraisement, he determined the fair value of Betty's estate at her death was $649,056.72. Included in this

initial inventory and appraisement was the value of miscellaneous silver at $430,000.00. Lonnie testified that value included the approximately $260,000.00 he received from selling some of the silver that he intended to keep for himself. In the amended inventory and appraisement, he removed a checking account and certificate of deposit from the estate, reducing the estate value to $599,658.20. Unspent funds from the silver he sold before his mother's death as well as any remaining metal bars and coins are in Lonnie's safe in Olympia.

In the memorandum decision, the trial court ordered Lonnie to file a formal appraisal of any remaining items within 45 days of the court's entry of findings and conclusions. Lonnie filed this formal appraisal, which valued coins and paper currency at $9,234.00. After this formal appraisal, the court entered an order confirming the final trial judgment and accepting the appraisal. Based on the evidence presented, the trial court determined that no grounds existed to remove Lonnie as personal representative, when Lonnie inventoried the silver and other assets of the estate in the necessary pleadings in the probate, including the silver he had sold for himself. Because this determination is supported by substantial evidence, we hold that the trial court properly denied Aaron's request to have Lonnie removed as personal representative.

3.      *Whether the trial court erred in finding that the written instructions left by Betty properly distributed all of her silver to Lonnie*

Aaron contends that Betty's attempt to transfer the silver bars and coins to Lonnie by written instruction failed for three reasons: (1) the silver coins are normal currency or legal tender and thus are excluded from transfer by written instruction under RCW 11.12.260(4), (2) the written instructions failed to describe the silver bars and coins with reasonable certainty as required by RCW 11.12.260(1), and (3) the written instructions failed to describe the recipients of the silver bars and coins with reasonable certainty where it permitted Lonnie to distribute them "as he shall determine or to retain for himself." Ex. P-14. Lonnie and the estate argue that Aaron misinterprets RCW 11.12.260(4), which allows "precious metals in any tangible form, for example bullion or coins," to pass by as separate writing. Lonnie and the estate also argue that the written instructions described the property and its recipients with reasonable certainty in accordance with RCW 11.12.260(1).

RCW 11.12.260(1) permits distribution of property by separate writing where an unrevoked will refers to such a writing "that directs disposition of tangible personal property not otherwise specifically disposed of by the will . . . ." The statute also requires that the writing be "in the handwriting of, or signed by, the testator or grantor" and describe "the items and the recipients of the property with reasonable certainty." RCW 11.12.260(1). Under the statute, "tangible personal property" means

15

articles of personal or household use or ornament, for example, furniture, furnishings, automobiles, boats, airplanes, and jewelry, as well as *precious metals in any tangible form, for example, bullion or coins.* The term includes articles even if held for investment purposes and encompasses tangible property that is not real property. The term does not include mobile homes or intangible property, for example, *money that is normal currency or normal legal tender*, evidences of indebtedness, bank accounts or other monetary deposits, documents of title, or securities.

RCW 11.12.260(4) (emphasis added). No published case has interpreted this statute.

Here, article II of Betty's will referred to a list of written instructions for distribution of her tangible personal property. The written instructions left "to Lonnie O. Lowe any and all silver coins and bars to distribute as he shall determine or to retain for himself." Ex. P-14. The written instructions also referenced the clause in Betty's will related to such instructions.

Aaron raises two issues under RCW 11.12.260 with regard to Betty's written instructions. The first issue is whether Betty's written instructions for the silver bars and coins described the property and its recipient with "reasonable certainty." For the description of the property, Betty listed "any and all silver coins and bars." Ex. P-14. The descriptor "any and all" does not create any ambiguity and is generally broadly inclusive. Aaron's only argument with regard to the description of the property is the same argument he makes throughout his briefing—that Lonnie has not provided a comprehensive inventory and appraisal of the silver bars and coins. However, as discussed above, Aaron has not produced sufficient evidence that the three inventory and

16

appraisals Lonnie filed with the court were inaccurate or incomplete. Therefore, Aaron's argument that Betty's written instructions failed to describe the property with reasonable certainty is unsuccessful.

Aaron also contends that Betty's description of the recipient of the property is not sufficiently certain. His argument is based on the clause granting Lonnie discretion to distribute the property as he determines or to retain it for himself. It is a valid testamentary disposition to leave property to be disposed of at the discretion of another. *In re Estate of Lidston*, 32 Wn.2d 408, 417-18, 202 P.2d 259 (1949). Thus, Betty's instruction describes the recipient with reasonable certainty even where it grants Lonnie the discretion to dispose of the silver bars and coins as he determines.

The second issue under RCW 11.12.260 is whether the statute permits the silver coins to pass by separate writing. Issues of statutory construction are reviewed de novo. *In re Estate of Black*, 153 Wn.2d 152, 164, 102 P.3d 796 (2004). "Statutory interpretation begins with a statute's plain meaning." *Manary v. Anderson*, 176 Wn.2d 342, 352, 292 P.3d 96 (2013). This court must contrast the plain meanings of the two italicized phrases above—"precious metals in any tangible form, for example, bullion or coins" and "money that is normal currency or normal legal tender." Those items encompassed within the first phrase may be transferred as personal property under RCW 11.12.260(4), whereas those items encompassed within the second phrase may not.

17

"Currency" is defined as "[a]n item (such as a coin, government note, or banknote) that circulates as a medium of exchange." BLACK'S LAW DICTIONARY 465 (10th ed. 2009). Similarly, "legal tender" is "[t]he money (bills and coins) approved in a country for the payment of debts, the purchase of goods, and other exchanges for value." *Black's, supra*, at 1035. Both definitions describe bills or coins presently used to purchase items of value. In contrast, precious metals, such as bullion or coins, are often kept either for their sentimental value or for investment purposes, and the value varies based on the prevailing prices on the precious metals market. *See Seattle-First Nat'l Bank v. Tingley*, 22 Wn. App. 258, 261-62, 589 P.2d 811 (1978).

In his testimony, Aaron described the silver coins that his father collected:

> From like '64 and earlier, the coins were 92 to 93 percent silver, and after that they became a sandwich of copper in the middle with nickel on the outside. So the earlier coins just for the amount of silver in them was worth much more, and [my father] could foresee that they were going to be worth a lot more in the future.
>
> . . . .
>    . . . I think he slipped some money to the ladies at the bank, because when those coins came into various banks, they separated those coins for him and he would go pay extra money for those coins.

RP at 118. Because Donald paid a premium for the silver coins in anticipation of greater worth in time, we determine that the coins at issue are best classified as precious coins rather than normal currency for purposes of RCW 11.12.260. We, therefore, conclude that the trial court properly determined that Betty's written instructions were sufficiently

18

definite and that the silver coins were tangible personal property rather than intangible currency.

4.      *Whether Lonnie improperly accepted or retained gifts during Betty's lifetime under his power of attorney*

Aaron contends Lonnie made gratuitous transfers of Betty's property to himself without authority because the power of attorney Betty signed did not contain specific authorization to make such gifts. Lonnie argues, and the trial court concluded, that he did not make any transfers to himself under his power of attorney. Instead, Betty made cash gifts to Lonnie during her lifetime out of the proceeds from the sale of the silver.

While it is true the power of attorney Betty signed did not contain an authorization for Lonnie to make gifts to himself, Aaron provides no evidence to show that Lonnie made such a gift in violation of the power of attorney. Aaron cites *Estate of Lennon v. Lennon*, 108 Wn. App. 167, 29 P.3d 1258 (2001) in support of his contention. There the attorney-in-fact was a signator on the principal's account and wrote "Christmas checks" from the account before the principal's death. *Id.* at 183. The attorney-in-fact unsuccessfully argued that the decedent had instructed him to write the gift checks. *Id.* at 182-83.

Here, Aaron does not contend that Lonnie transferred funds from the accounts he shared with his mother as joint tenant. Instead, he argues that Lonnie had possession of the silver, which his mother may or may not have directed him to sell. Because Lonnie

19

was in possession of the silver, his mother never had access to the proceeds from the sales and, thus, could not have gifted him any cash proceeds. Instead, Aaron argues, Lonnie gifted himself the cash proceeds from the sale. The bases of Aaron's contentions are Lonnie's failure to produce any evidence of these cash gifts, Betty's complaints that Lonnie controlled her money and requests for money from Aaron, and Lonnie's testimony that he handled Betty's money and kept her cash in his safe.

None of this is direct evidence like that produced in *Lennon*. Aaron did not produce direct evidence of his claim, only circumstantial evidence, and Lonnie denied that he made gifts to himself. Lonnie testified that he did not make any transfers to himself under the power of attorney; instead, his mother made gifts to him. The trial court weighed competing evidence and found that Lonnie did not improperly accept or retain gifts under his power of attorney. Because this finding is supported by substantial evidence, we will not reverse it.

5.     *Whether the trial court erred in finding that Lonnie did not commit tortious interference with his brother Aaron's right to inherit*

Aaron argues that the trial court erred when it declined to recognize the tort of tortious interference with an inheritance expectancy. While no Washington court has adopted this tort, he argues that Washington case law recognizes the tort of wrongful interference with a business expectancy, which is sufficiently analogous. He also cites cases from other jurisdictions that have recognized this tort or extended the tort of

20

interference with a business expectancy to include inheritance expectancy. Lonnie argues that even if this court were to adopt the tort of interference with an inheritance expectancy, the applicable burden of proof is clear, cogent, and convincing evidence, and Aaron presented no evidence to meet this burden here.

Two published Washington cases have considered this tort, but neither adopted it. In the first case, *Hadley v. Cowan*, the appellants filed a will contest alleging lack of testamentary capacity but later agreed to settle and dismiss their will contest. 60 Wn. App. 433, 436, 804 P.2d 1271 (1991). After the settlement, the appellants filed a tort action against the will beneficiaries alleging tortious interference through undue influence, duress, fraud, abuse of confidence, and substitution of the beneficiaries' intent for the intent of the testator. *Id.* at 437-38. The court held that the settlement barred the later claim for tortious interference. *Id.* at 438-40. The court also applied the doctrine of res judicata and determined that the claims of undue influence and interference with inheritance come from "a single 'transactional nucleus of facts' that could and should have been determined in the probate challenge." *Id.* at 442. *Hadley* thus avoided the issue of whether Washington should adopt the tort of interference with an inheritance expectancy.

In the second published case, *Grange Insurance Association v. Roberts*, 179 Wn. App. 739, 760-61, 320 P.3d 77 (2013), *review denied*, 180 Wn.2d 1026, 328 P.3d 903 (2014), the court reviewed case law from other jurisdictions analyzing this tort and cited

21

the definition in the *Restatement (Second) of Torts* § 774B (1979). From its review of other case law, the court determined that most if not all jurisdictions recognizing the tort of interference with an inheritance expectancy require an intentional act. *Id.* at 764-65. The court held that because the claimant's insurance policy excluded coverage for intentional conduct, the trial court properly concluded the insurance company had no duty to defend the claimant as to the tortious interference claim. *Id.* at 765. Thus, the court again avoided the issue.

Washington has adopted the tort of interference with a business or economic expectancy, which consists of five elements: "(1) existence of a valid contractual relationship or business expectancy, (2) defendants had knowledge of that relationship, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) defendants interfered for an improper purpose or used improper means, and (5) resultant damage." *Id.* at 760-61. In its memorandum decision, the trial court below stated that courts recognizing interference with inheritance require proof of: "(1) a valid expectancy; (2) intentional interference with that expectancy; (3) independently tortious conduct (such as undue influence, fraud, or duress); (4) reasonable certainty that absent the tortious interference the plaintiff would have received the expectancy; and (5) damages." CP at 146.

Aaron argues that the trial court committed reversible error by requiring proof of independent tortious conduct, such as undue influence, fraud, or duress, instead of only

22

an "improper purpose." Br. of Appellant at 63. Aaron's argument is a distinction without a difference. The trial court's element of independent tortious conduct is essentially the same as the improper purpose element. Additionally, the *Restatement (Second) of Torts*, which Aaron quoted in his brief, defines the tort of "Intentional Interference with Inheritance or Gift" as a cause of action against "'[o]ne who by *fraud, duress or other tortious means* intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received'" subjecting the tortfeasor to "'liability to the other for loss of the inheritance or gift.'" RESTATEMENT, § 774B (emphasis added).

Even if this court was to extend Washington's definition of tortious interference with a business expectancy to include inheritance expectancy, Aaron has not proved that his brother acted with an improper purpose or used improper means. The silver treasure properly descended to Betty by intestate succession. The trial court rejected Aaron's argument that Lonnie exerted undue influence over Betty or that Betty lacked testamentary capacity. Although different triers of fact could come to different findings, the trial court found that Lonnie did not engage in any independent tortious conduct. Rather, it was Betty's treasure and as a competent person unaffected by undue influence, she had the right to spend it or devise it in the manner she wished. Substantial evidence supports the trial court's finding. Because the trial court did not find facts necessary to

23

support the theory, we decline to express an opinion whether Washington recognizes a cause of action for tortious interference with inheritance expectancy.

6.      *Whether the trial court erred in requiring Aaron to pay for Lonnie's and the estate's attorneys' fees*

Aaron argues he was entitled to attorney fees against the estate in the trial court because he prevailed in proving that a formal appraisal was necessary. Alternatively, he argues that where both parties prevailed, neither is entitled to fees. Lonnie disagrees and argues that the trial court properly awarded fees to him and the estate as the prevailing parties.

Both trial and appellate courts have broad discretion to award attorney fees in litigation involving trusts and estates. RCW 11.96A.150(1) provides:

> Either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. . . . In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.

This court will review a trial court's decision as to attorney fees for an abuse of discretion. *Estate of Black*, 153 Wn.2d at 173. Discretion is abused when it is exercised in a manner that is manifestly unreasonable, on untenable grounds, or for untenable reasons. *Emmerson v. Weilep*, 126 Wn. App. 930, 940, 110 P.3d 214 (2005).

24

Here, the trial court ordered Aaron to pay Lonnie's and the estate's reasonable attorney fees because Lonnie and the estate prevailed, and it would not be appropriate to assess all of the fees against the estate because "'the litigation could result in no substantial benefit to the estate.'" CP at 316 (quoting *In re Estate of Niehenke*, 117 Wn.2d 631, 648, 818 P.2d 1324 (1991)). We agree with the trial court that the estate prevailed.

In addition, whether Aaron's "'litigation could result in no substantial benefit to the estate" is not germane under the statute, as the inquiry is whether the litigation "benefit[ed] the estate." It did not.

The fact that Aaron achieved some benefit by requiring Lonny to file an appraisal of the silver bars and coins does not change the fact that Lonnie and the estate prevailed on all of the significant and contested issues. We see no abuse of discretion, and affirm the trial court's fee decision.

7.      *Whether to award Lonnie his attorney fees on appeal*

Lonnie prevailed on appeal, and we affirmed the trial court's discretionary fee award to the estate and him individually. Nevertheless, RCW 11.96A.150(1), quoted above, affords this court discretion when determining whether to award fees and costs to the prevailing party on appeal. Since discretion assumes that two decision makers

25

No. 32192-4-III
*In re Estate of Lowe*

may reach different outcomes, the trial court and we may disagree on the appropriateness of an attorney fee award.

We exercise our discretion and deny Lonnie an award of attorney fees.[1] Lonnie acted within his legal rights to keep all the silver treasure, but this treasure ably allows him to afford the expense of this appeal.

CONCLUSION

We therefore affirm the trial court on all issues, and deny Lonnie's request for attorney fees on appeal.

Affirm.

Lawrence-Berrey, J.

I CONCUR:

Fearing, J.

---

[1] Although we deny attorney fees on appeal, Lonnie is entitled to costs under RAP 14.2 as the prevailing party.

No. 32192-4-III

SIDDOWAY, C.J. (dissenting in part) — I disagree with the reason offered for denying fees and costs on appeal. As only one judge on a panel of three, however, I bow to the fact that we, not I exercise discretion to make such an award.

_Siddoway, C.J._
Siddoway, C.J.