IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Estate of ARLA MAE L. ROHATSCH | No. 82861-4-I |
| MARY PETERSON, heir and beneficiary of the Estate of Arla Mae Rohatsch, | DIVISION ONE |
| | UNPUBLISHED OPINION |
| Respondent, | |
| v. | |
| KATHY NORSWORTHY, a married woman and personal representative of the Estate of Arla Mae Rohatsch, | |
| Appellant. | |

COBURN, J. — Kathy Norsworthy appeals a trial court's ruling that, as the personal representative of her mother's estate, she breached her fiduciary duties to the estate and her co-heirs, her two sisters, by mismanaging estate funds and assets. Kathy[1] primarily challenges the trial court's findings of fact that she intentionally misrepresented the value of the estate's main asset, a Kenmore property, in order to justify an expensive renovation project designed to enrich

---

[1] For clarity and consistency, we refer to each family member by their first name.

Citations and pin cites are based on the Westlaw online version of the cited material.

herself and deprive her sisters of their inheritance. We affirm the trial court.

FACTS

Arla Mae Rohatsch had a stroke in May 2016 and gave Kathy, one of her three daughters, power of attorney over medical and financial decisions. After Arla moved out of the home and into an assisted-living facility in May, Kathy initiated renovations on Arla's home. Kathy hired herself, her husband Joe, a carpenter, her son Michael, an electrician, as well as her daughter-in-law Ashley. Kathy stated she had hired her husband and son because Arla had paid them in the past to perform work on the house. However, this time, according to Kathy, Joe and Michael agreed not to be paid until the house was sold and so no bills for their work were presented to Kathy during the renovations.

By the time Arla had moved back into her home in August of 2016, the house had been cleaned, the living room, dining room, and hallway had been painted, and the upstairs floors had been refinished. Renovations were paused when Arla had returned to the home. Arla passed away on August 3, 2017.

Arla was survived by three daughters: Kathy, Annette Ferrin, and Mary Peterson. In October 2017, Arla's will was admitted to probate and the court appointed Kathy as personal representative of the estate, granting her nonintervention powers. Arla's will had appointed Kathy as executor and trustee of her estate, but she had bequeathed all of her property at her time of death "in

2

equal shares" to her living children.

The main asset of Arla's estate was her 1966 Kenmore home. The sisters disagreed about how to manage the house. Mary wished to immediately sell the home, but Kathy wanted to make more improvements before selling it. Though Mary objected, Kathy elected not to list the property in 2017 and instead perform more renovations at the expense of the estate.

Kathy quickly changed the locks on the Kenmore home, preventing Mary from accessing it. Kathy then began her renovations a week after Arla died. More than a year later, in September 2018, Kathy listed the home for sale. The house did not sell until June 2019, at which time it sold for $575,000.

After the sale of the home, Mary obtained legal counsel and requested that Kathy provide an accounting of the estate. In November 2019, Kathy provided Mary with an inventory of the estate under penalty of perjury. Kathy stated that the home had been in "deplorable condition," and covered in tobacco, blood, urine, fecal matter, and black mold. She noted that she had received four appraisals from realtors (Jacqueline Owens, Bunsong Pumma, Marco De Olivera, and Logan Smith) in 2017 and all of them valued the property at $200,000. She said that three of the four realtors were not interested in the listing and told Kathy to sell it for the value of the land, as the property was a "complete tear down in their opinions." Kathy indicated that the home

renovations—performed by herself, husband, and son—totaled $301,000.

Mary continued to request additional information. By stipulated order, Kathy agreed to provide a certified accounting of the estate which would include written evidence of expenses Kathy spent renovating the house. In Kathy's May 2020 certified accounting of the estate, she declared that the estate included, among other items, $19,595.76 in savings bonds, a $4,200 gun collection, and two items that were distributed to Annette as an inheritance distribution: a $5,000 coin collection, and a $5,000 oil painting. Kathy also alleged that Annette had stolen $9,657 from Arla's bank account, which she considered a preliminary distribution of Annette's inheritance. She again declared that at the time of Arla's death, the value of the Kenmore home as a "tear down" was worth only $200,000 in "land value only." Kathy listed her "[r]epairs in prep[aration] for [s]ale" as $280,386.02. She declared $13,495 in separate expenses for staging the home for sale.

In June 2020, Kathy attempted to close probate by filing a Declaration of Completion of Probate. In July 2020, Mary filed a Trust and Estate Dispute Resolution Act (TEDRA) petition to remove Kathy as the personal representative of the estate and prevent her from seeking final reimbursements, noting that there were "significant accounting and probate administration irregularities" in the managing of the estate that needed to be reviewed. Mary filed an amended

4

petition in September 2020 specifically alleging that Kathy had breached her fiduciary duties to the estate by falsely representing the condition of the Kenmore property, performing unnecessary renovations, and charging the estate improper charges. Mary alleged that Kathy had insufficient documentation to justify estate expenses. Mary also claimed that Kathy failed to fully account for $89,000 in savings bonds, health care costs incurred prior to Arla's death, a gun collection, and several other items of value.

In response to Mary's petition, Kathy admitted that some of the house repairs had happened prior to their mother's death, but reiterated her claims that the house was in disrepair and the property was worth only $200,000 in August 2017, and that Mary's allegations regarding the breach of fiduciary duty were unsupported. Kathy asked the court to dismiss Mary's TEDRA petition.

The court certified the case for a bench trial.

At trial, Mary presented evidence that the Kenmore property was worth significantly more than $200,000 at the time of Arla's death in August 2017 and that Kathy knew the true value.

Realtor Bunsong Pumma testified that he visited the Kenmore property in mid-August 2017. He stated that while the home contained a lot of clutter, he did not see any mold (something he "would have seen or noticed") or dirty walls. He told Kathy that she could do some renovations to update the property into

"turnkey condition," if she did some repairs such as electrical work, painting siding, and a sewer scope. But Pumma testified that he told Kathy the fair value of the home was $480,000 without renovations, and $100,000 spent in renovations would simply increase the value of the home by the same amount spent, that is, only to $580,000. Pumma testified he never told Kathy the home was a tear down or that the property was worth $200,000. Pumma stated that he sent Kathy and her son Michael an email with the comparative market analysis on the property.

Realtor Jacqueline Owens testified that she provided Kathy with a "drive-by" "guesstimate" of the house in 2015, prior to Arla's passing, at which time she said the value of the house was $350,000, depending on the interior condition. When Owens went to see the home in May 2016, the year before Arla died, she said the house appeared to be "in extreme dishevel" with a lot of safety issues and the smell of mold. But Owens indicated that she never told Kathy the property was worth $200,000 or was a tear down, because in her opinion, there was "too much value there for a teardown." When Kathy asked Owens to list the home for sale in September 2018, more than two years after she saw the home in May 2016, Owens recommended she list the house at $599,000.

Mary was unable to contact Marco De Olivera, the third realtor Kathy indicated in her November 2019 accounting who had told her the property was

worth $200,000.  The fourth realtor Kathy cited in her accounting, Logan Smith, did testify at trial, clarifying that he was not a realtor but a financial advisor who does not advise clients about real estate services and did not know Kathy.

Jill Albright, the realtor that listed the home in May 2019, testified that she never saw the house in 2017, at the time of Arla's passing, but it looked nice at the time she saw it in April 2019.

Kathy admitted her statement that she had four estimates from four realtors about the home value in 2017 was "not true."  She testified that Pumma never told her the house was worth $200,000 or a teardown, it was just something she "assumed" to be true.  She continued to suggest that "Marco," the individual who could not be found for trial, told her the house was a tear down, but she did not receive anything in writing and she could not remember his last name or if he was a real estate appraiser.

Mary's theory of the case was that Kathy lied about the value of the house to justify her renovation expenditures and thus deprive her sisters of their inheritance.  Mary provided testimony from her daughter and husband that the home was in good condition at the time of Arla's passing.  She also submitted

photos and videos from the home at a December 2016 family gathering.[2]

Mary also provided a text message thread between Kathy and Annette's ex-husband Brian from March 2018. Kathy's text messages read:

I'm hiring an attorney to finish and taking back my life. I'm charging the estate for all the time and labor my family ha[s] . . . put into the house. I'll use the original estimate before improvements were made to the house of 211k. Minus debt to ours . . . I hope there's no money left to be distributed.[3]

Kathy admitted that she had sent the text messages to Brian, but insisted that it was "simply just said in anger" and was not suggestive of how she administered the estate. Kathy argued at trial that she believed the renovations to the house were necessary for the sale of the house and all of the expenditures were reasonable.

Mary spent much of the trial challenging Kathy's $280,386.02 in

---

[2] Kathy also introduced dozens of photos of Arla's property into the trial record purporting to show the house's poor condition prior to the remodel. Because the photographs were not individually marked and only identified as a single exhibit, references to photographs in the record were often unclear as to which photograph was being discussed. Kathy testified that she took several of the photos in the summer of 2016, and other photos in 2017, and that they reflected the need for the renovation work that was done. Witnesses testified that some of the photos were taken well before 2016 and that work was done in those areas before Arla died: photo of filthy carpet in Arla's bedroom that was removed in 2012 or 2013 before her death; photo of deck with missing boards that was being remodeled in the 1990s; photo of kitchen from before damaged wood was replaced in 2005 or 2006 and before the floors were recoated prior to Arla's death.

[3] The three text messages submitted into the record as Petitioner's Exhibit 5 appear to have been received electronically out of order. Testimony at trial corroborated this reading. We have presented the text messages in the order the messages were sent according to the testimony at trial.

expenditures for the renovation.

Pumma testified that the fair market value of the Kenmore home in August 2017 was $480,000 without any renovations. The sisters agreed that some house renovations had occurred prior to Arla's death. Kathy acknowledged at trial that she had charged the estate for renovations made before Arla died because she was unable to file a creditor's claim for the earlier work against the estate. Kathy also admitted that she cleaned the house prior to Arla's death, and by August 2017, there was no urine, fecal matter, and blood in the house.

For the claimed renovations that took place after Arla's death, Kathy and her family provided most of the labor. The estate paid Kathy varying hourly wages: $25 to check doors and windows after a realtor visit, $35 for painting, $50 to remove rotted wood, $65 to trim laurel hedges, and $70 to wash windows. The estate paid Joe various hourly wages between $50 and $100. Joe testified that he was paid journeyman-level carpentry wages even when he was performing tasks such as spreading gravel. Joe also testified he was not aware that Kathy had ever investigated hiring other individuals to perform some of the tasks at a lower wage. Kathy testified that day labor was "rather inexpensive" and always available and that she did use it for some of the work on the house.

Kathy conceded at trial that, due to her choice to pay herself for the house repairs, she would receive "substantially more" than her sisters from the estate

and that her husband and son would thereby be allowed to share in the proceeds.

Kathy claimed that she had "several estimates" quoted for the house. Her testimony was that she received window, furnace, vent, garage door, and mold remediation estimates. But she testified that she could not locate the estimates or that the estimates were illegible. Despite testimony that she received the estimates, Kathy indicated that she was unaware of how much the renovation would end up costing the estate.

Mary elicited testimony establishing that many of the estate's expenditures were incorrect or exorbitant to the benefit of Kathy and her family. Kathy charged $13,495 for staging the home for sale. Kathy admitted at trial that she used some of Arla's preexisting furniture and the staging amounts for 2018 were incorrect and should have been "about half the amount." Kathy said someone named "Denise" told her what she should charge for staging, but she did not know Denise's last name and that she had since moved out of state. Kathy admitted she also used new furniture for the house staging, charged the estate to rent that furniture, at an amount that was greater than the purchasing price, and then kept the furniture for herself. In another instance, Kathy charged the estate $25 an hour for her to visit the property 196 times to "[c]heck doors and windows after realtor showings." At trial, Kathy admitted that she may not have done all of

the trips to check the house. Joe testified that pressure washing Arla's garage should have taken one hour, but Kathy charged the estate for 16 hours of pressure washing the garage floor. Joe also testified that he kept a $439.97 paint sprayer that the estate purchased.

Mary also elicited testimony that contradicted some of the work Kathy claimed she had performed on the home. Despite Kathy having hand surgery in July 2018, which required six weeks of recovery, Kathy charged the estate for her labor in demolishing a deck and building a new one. Kathy also testified that she had no problem moving a solid wood, six-foot wide sleigh bed[4] by herself up the stairs and into the bedroom for staging. She later clarified that her earlier testimony had been untrue, blaming her low blood sugar at the time for the mistake.

Kathy was unable to track or identify many of the expenditures for the home. Joe testified that at the end of each work day, Kathy would write down the hours in a notebook and then transfer those numbers to the computer. Joe did not know where the notebook was. Kathy never testified about a notebook but stated she made "notes to [her]self" on what the estate money was used for and did not keep the notes after entering the expenditures into the computer. Kathy testified that she could not locate the electronic document.

---

[4] A bed resembling a sleigh with an outward curving headboard and footboard.

11

Most expenses did not have receipts or any documentation at all, other than the accounting document Kathy created and provided to Mary once it was requested by her attorney.  The estate was charged $28,734.15 for the installation of new windows.  But Kathy claimed that all the invoices for the windows had faded and that she threw them away.  It did not "cross [her] mind" to take pictures of receipts before they faded.  The court questioned the lack of dates on invoices.  Kathy said she did not realize dates were missing because she could "barely see" due to her glaucoma.  Kathy could not remember when she received cash from selling the lawnmower for $500 due to "mini strokes" that impeded her memory.  She could not recall how she stored bank statement files.  She would repeatedly write herself checks from the estate but could not recall what the check was for or how the money was spent.  Kathy did not retain receipts for items purchased with cash.  Some purchases were made after the house sold.  In addition, Kathy admitted that she used estate funds to pay off thousands of dollars in personal lines of credit from multiple financial institutions and did not keep the receipts for the related expenses.  Kathy testified that she did not track things carefully because she never thought there "was going to be an issue."  She testified that she did not keep receipts because she did not expect her sisters to sue her.  It was only after her sister hired an attorney, in early 2020, that she realized she might need help with personal representative

duties.

With regard to the other assets of the estate, Kathy admitted that the oil painting she had charged as a pre-distribution asset to Annette had been obtained by Annette prior to Arla's death. Kathy did not know the actual value of the painting. Kathy acknowledged that she valued the coin collection, another pre-distribution to Annette, at $5,000 by looking at websites based on coins she could remember, but she did not have any screenshots of the websites. According to Kathy, the $9,657 preliminary distribution charged to Annette was based on an alleged theft that was supposed to have happened in September 2016—prior to Arla's death—when the bank notified Kathy that the withdrawals were made by Annette. Kathy stated that she knew the money had not been a gift from their mother. But Kathy did not have any account statements showing any such withdrawals after Arla's passing. Later, Kathy produced the bank statements from around that period where she handwrote "Fraud" on the statements that did not establish Annette withdrew $9,657 from Arla's account.

Kathy claimed she had Arla's gun collection appraised by a man named "Gary Harris" and received $4,200 for them, but she could not remember the date she sold them and may not have deposited the money into the bank.

Mary's husband testified that Kathy said during a family meeting, after Arla died, that Arla had roughly $89,000 in savings bonds. Mary testified that while

13

some of that money would have been used for Arla's medical care, there was approximately $44,000 that was unaccounted for. Kathy stated the bonds at the time of Arla's passing were valued at $19,595.76. Kathy did not track how the bonds were spent.

At the end of trial, the trial court ruled that Kathy breached her fiduciary duties. The trial court found that Kathy had "wasted, mismanaged and potentially embezzled" from the estate. The trial court concluded that Kathy made untruthful statements to justify renovations, destroyed records, failed to provide estimates before undertaking the work and had no budget for renovations. The court found Kathy not to be a credible witness, untruthful in her inventory of estate assets, and engaged in self-dealing, favoring herself above the other heirs.

In the court's written order, it removed Kathy as personal representative of the estate and assessed damages against Kathy and her marital estate in the amount of $308,725.46. The trial court explained the damages:

> Respondent's actions, omissions, and decisions in performing her duties as the Personal Representative, which she undertook for the benefit of her marital community, caused the Estate and its beneficiaries damages in at least the following amounts: (1) $200,868.46 due to the difference that the Estate would have received from selling the home "as is" compared to the amount the Estate received after Respondent charged the Estate $280,386.02 to renovate the Real Property; (2) $19,657 in preliminary distributions charged to Annette that were based on withdrawals prior to the decedent's death and Respondent's testimony about the value of a painting and coins that Respondent claimed Annette took, which testimony this Court did not find to be

14

credible; (3) $44,000 in savings bonds for which Respondent could not account; (4) $4,200 for the gun collection that Respondent claimed she sold but for which sale she could not show the Estate received the proceeds; and (5) at least $40,000 in general damages for Respondent's inflated and unsubstantiated charges for renovations, and other miscellaneous Estate assets that she failed to properly marshal, inventory, and sell. The total damages caused to the Estate by Respondent amount to, conservatively, at least $308,725.46.

The court ruled that Kathy "shall receive no share [of the damages] as part of her inheritance." The trial court also awarded Mary attorneys' fees and costs pursuant to RCW 11.96A.150.

Kathy appeals.[5]

## DISCUSSION

Superior courts have limited authority over nonintervention probate matters. In re Est. of Jones, 152 Wn.2d 1, 9, 93 P.3d 147 (2004). However, heirs have the statutory authority to challenge the actions of a personal representative where a personal representative breaches a fiduciary duty to the estate, allowing courts to intervene and assess if a personal representative faithfully discharged their duties. Id.; RCW 11.68.070(1)(a)(i).

"The personal representative stands in a fiduciary relationship to those beneficially interested in the estate. [They are] obligated to exercise the utmost

---

[5] Kathy appeals the Judgment, Stipulation, and Agreed Order entered on June 18, 2021. She did not specifically appeal the May 28, 2021 Findings of Fact, Conclusions of Law, and Order, but it is the basis for the June 18 order.

good faith and diligence in administering the estate in the best interests of the heirs." Matter of Est. of Larson, 103 Wn.2d 517, 521, 694 P.2d 1051 (1985). A personal representative must also utilize the skill and judgement used by an "ordinarily cautious and prudent person in the management of her own business affairs." In re Est. of Fleming, 98 Wn. App. 915, 919, 991 P.2d 128 (2000).

If the court finds the personal representative has breached a fiduciary duty, it is permitted to order a remedy such as removing the personal representative. RCW 11.68.070(2). RCW 11.28.250 provides that a personal representative can be removed "[w]henever the court has reason to believe that any personal representative has wasted, embezzled, or mismanaged . . . the property of the estate committed to [their] charge." The record must support valid grounds for removal. In re Est. of Jones, 152 Wn.2d at 10.

Findings of Fact

On appeal, Kathy challenges 54 of the trial court's 71 findings of fact. Challenged findings of fact supported by substantial evidence—"evidence 'sufficient to persuade a rational, fair-minded person of the truth of the finding'"— will be upheld on appeal. In re Est. of Lowe, 191 Wn. App. 216, 229, 361 P.3d 789 (2015) (quoting Jones, 152 Wn.2d at 8)). Any unchallenged findings of fact are verities on appeal. Matter of Est. of Little, 9 Wn. App. 2d 262, 274, 444 P.3d 23 (2019).

Some of the findings Kathy challenges encompass multiple facts and cover several topics. Kathy fails to identify with specificity whether she challenges each of these findings in their entirety or only portions of the findings. Where Kathy does not address the challenged finding of fact with further argument or reference in her briefing, we "deem them abandoned" and do not address them. Seattle Sch. Dist. No. 1 of King County. v. State, 90 Wn.2d 476, 488, 585 P.2d 71 (1978). "Counsel is obligated to demonstrate why specific findings of the trial court are not supported by the evidence and to cite to the record in support of that argument." In re Est. of Palmer, 145 Wn. App. 249, 265, 187 P.3d 758 (2008).

We also note that the trial court made several credibility findings and found Kathy not credible, including the finding that "[o]verall, the testimony presented by the Respondent regarding the necessity for and validity of the renovation documentation, costs, and labor charges was not credible." Kathy challenges this finding, but fails to recognize that the trial was a bench trial, and the court was, thus, the trier of fact. The trier of fact, "which observes the witness's manner while testifying, alone passes on a witness's credibility and measures the weight of the evidence." In re Est. of Palmer, 145 Wn. App. at 266.

With that understanding, we decline to address further any finding of fact supported by substantial evidence where any challenge is entirely dependent on

17

Kathy's own testimony, which the trial court found to be not credible.  Where we can discern what remaining findings Kathy appeals, we address each in turn.

A.  *Finding of fact 53*

The court found that the

Respondent's renovations increased the value of the Real Property by $79,517.56, for which the Estate paid Respondent and her immediate family $200,868.46, and for which Respondent charged an additional $80,000, not including staging costs of over $13,000 that Respondent paid herself. The renovations' overall detrimental cost to the Estate is demonstrated as follows:

| Pumma Valuation August 2017 | Respondent's Claim as of August 2017 |
|---|---|
| Profit without Renovations: $440,125.66 | Profit Without Renovations: $200,000.00 |
| Renovation amount: $100,000.00 | Renovation amount: $280,386.02 |
| Profit with Renovations: $540,125.66 | Profit with Renovations: $519,643.22 |
| Net Profit (deduct renovation costs): $440,125.66 | Net Profit (deduct renovation costs): $239,257.20 |

Total Detriment to Estate: $200,868.46

Pumma testified that the fair market "as-is" value of the home was $480,000 soon after Arla died and any of the recommended improvements would have only increased the value of the home dollar-for-dollar up to $580,000.  Pumma estimated that without renovations, the anticipated net profit would be $440,125.66.  The court found Pumma's testimony to be credible and any

contradictory evidence presented by Kathy not to be credible.  The house eventually sold in 2019 for $575,000 with a net profit of $519,643.22 before subtracting the renovation costs.  After subtracting the $280,386.02 that Kathy listed as the cost of repairs in preparation for the sale, the net profit dropped to $239,257.20, almost half as much as estimated if the house had sold in 2017 without renovations.  Substantial evidence supported the court's finding that the renovations had an "overall detrimental cost to the Estate" of $200,868.46, the difference between the estimated net profit of $440,125.66 if the house had sold in 2017 and the net profit of $239,257.20 after the house sold in 2019, after subtracting the claimed renovation costs.

B.  *Finding of fact 59*

The court found that the

> Respondent also made unequal preliminary distributions of Estate proceeds to her own benefit. Indeed, other than an initial distribution of $5,000 distribution to each heir, Respondent proceeded to distribute at least $23,688.06 in checks written for cash or to herself. Respondent failed to properly account for preliminary distributions she made to herself.

This finding was supported by substantial evidence.  In Kathy's May 2020 accounting she notes over a dozen inheritance distributions she made to herself totaling more than $20,000, while making no equivalent distributions to her sisters.

C.  *Finding of fact 60, 61, 62*

19

Kathy next challenges the trial court's findings of fact related to the $19,657 in improper preliminary distributions she assigned to Annette. The court made the following findings.

60.     Respondent credited preliminary distributions totaling $30,388.72 to her sister Annette. Those distributions consisted of $5,000 for a painting that Respondent claimed Annette took. Respondent had no basis for assigning that painting a $5,000 value – she did not have it appraised, has no expertise in appraising paintings, and testified $5,000 represented its "sentimental" value. Respondent's declaration also states that Annette took that painting while Decedent was still alive, which means it was never part of Decedent's Estate. Finally, Respondent took no action to retrieve that painting on behalf of the Estate.

61.     The preliminary distribution to Annette also consisted of Respondent's claim that Annette stole from Decedent. The only evidence of that alleged theft provided by Respondent consisted of Bank of America statements showing withdrawals prior to Decedent's date of death. Accordingly, even assuming Annette received those funds, she received them from Decedent prior to Decedent's passing, not the Estate. Respondent did not identify a legal basis for including the painting and those allegedly stolen funds in Annette's preliminary distribution.

62.     Respondent also included in Annette's preliminary distribution coins from the Estate's safety deposit box that she allegedly gave Annette for Annette to appraise. Respondent did not take an inventory of those coins prior to giving them to Annette. She provided two photos of the coins in haphazard piles, but those photos do not allow anyone to determine the total number of coins, the kinds or dates of the coins, or their condition. Further, at the time Respondent allegedly gave those coins to Annette, Respondent was aware that Annette had previously embezzled funds, which the Will directed the personal representative to deduct from Annette's share, and Respondent believed that Annette had allegedly already taken funds from the Decedent's Bank of America

account. Given what Respondent knew about Annette, Respondent mismanaged Estate assets by entrusting Annette with them – even assuming Respondent's testimony as to what happened to the coins was accurate. Respondent's testimony regarding her preliminary distributions to Annette was not credible.

Kathy does not challenge that substantial evidence support the facts in these findings, but instead she argues that she credited the values "the best" she could and that Mary did not present evidence to the contrary.  Kathy admitted that Annette had taken the oil painting prior to Arla's passing.  There was no evidence that the value of the coin collection was $5,000.  Kathy was unable to provide proper documentation that would allow an assessment of the coins' value.  She admitted that she did not have the coins appraised but claimed she "looked up the value" of a few coins she had "looked at" and did not retain any records of actual value.  Kathy presented no evidence that Annette had stolen $9,657 from her mother's account after her passing.  Kathy admitted at trial that the alleged theft occurred in September 2016, almost a year before Arla died.  Moreover, the bank statements she submitted did not establish that Annette stole $9,657 from Arla's account.

Substantial evidence supported the trial court's findings.

## D.  Finding of fact 66

By performing the alleged renovations to the Real Property herself along with her immediate family without obtaining (or keeping) bids or estimates to use for comparison's sake or preparing a budget, destroying contemporaneous records of the

> work done and items purchased as part of those renovations, and then subsequently paying herself and her immediate family for those renovations, the Respondent engaged in self-dealing.

Kathy's payment of $19,204.36 to herself and her husband at a rate of $100 an hour for mold remediation is just one of many instances that supports this finding. Kathy had no training in identifying or remediating black mold but testified that she conducted testing, found black mold in every room of the house except one, and followed instructions from the hazardous waste facility in North Seattle. Kathy maintains that this was all done after Arla had died. This was contradicted by photographs and videos taken from a December 2016 family gathering and testimony from Mary's daughter and husband who testified that the home was in good condition at the time Arla died.

Kathy did present photographic evidence and Owens' testimony that she smelled mold in the house. But neither the photographs nor Owens' testimony established the timeline of when the mold was cleaned up or that the cost of $19,204.36 was reasonable. Owens testified that when she smelled mold in the house, it was in 2016 before Arla died.

Kathy also did not challenge the court's finding that Pumma, as part of his renovation experience and expertise, had training in identifying black mold within residential structures and possessed knowledge of the approximate costs for removing black mold.

During trial, Pumma was shown undated photos of the house that were

22

taken by Kathy prior to the remodel. Pumma testified that while there appeared to be mold in some of the photos, at the time he saw the house it was not as cluttered as depicted in the photos. Based on the photos, Pumma testified that he would recommend a mold expert's evaluation but thought it could "be done relatively inexpensively." Kathy offered no evidence to what a remediation company would have charged to complete the work.

Pumma testified that when he visited the home in August of 2017 he did not observe any black mold. When he has seen extensive mold, the bids to remediate it were between $8,000 and $10,000 and that was when black mold was halfway up the wall and throughout the house.

Kathy also admitted at trial that she had used estate funds to pay off thousands of dollars of personal lines of credit, which she claimed were used for the renovation, but she had no receipts to show this.

Substantial evidence supports the court's finding.

## E. Finding of fact 67

> Respondent also engaged in self-dealing by purchasing thousands of dollars' worth of furniture for the staging of the home, renting the furniture to the Estate, and then keeping that furniture for her own personal use. Respondent further engaged in self-dealing by purchasing a $439 paint sprayer, which a professional painter would have already had, and then allowing her husband to keep it.

Kathy charged $13,495 for staging the home for sale. While Kathy said she used

her own money to buy the furniture, she rented the furniture to the estate and charged a fee that together totaled more than the amount she paid for the furniture, which she kept. Kathy admitted that she made a profit. Kathy's husband admitted that he kept the $439 paint sprayer that was purchased by the estate. Substantial evidence supports the court's finding.

*F. Finding of fact 65*

Kathy argues that the trial court erred in finding that she breached her fiduciary duty and mismanaged the estate. She argues that she exercised good faith in relying on Owens' recommendations to address immediate safety issues to obtain a good sales price and that the court improperly applied a standard of care that equated to "perfect hindsight." The trial court found

> In exercising and performing her duties as the Personal Representative of the Estate, Respondent failed to: (1) exercise the utmost good faith, (2) utilize the skill, judgment, and diligence of an ordinarily cautious and prudent person in managing the Estate Assets, and (3) settle the estate without sacrifice to the Estate. Respondent wasted and mismanaged Estate assets.

Kathy ignores the fact that Owens did a drive-by of the house in 2015 and saw the house in 2016, a year before Arla died. She also ignores that much of the work was done on the house before Arla died and that Pumma's estimate was based on seeing the house in August of 2017, shortly after Arla died.

Overwhelming evidence established that Kathy elected to pay herself and her immediate family to renovate the property with the hope that there would be

24

"no money left to be distributed" under a false claim that the property was only worth $200,000 prior to the renovations. The property was in Kathy's complete control from August 2017 to the time the property sold in June 2019. Kathy spent nearly $280,386 on renovations to sell the property for $575,000 for a net profit of $239,257 in 2020, despite Pumma telling her in 2017 that the house could have sold for $480,000 without renovations for a greater estimated net profit of $440,125.

Kathy did not get bids or estimates for the renovations, exaggerated the reasons for the renovations, elected to pay herself and immediate family to perform the work without keeping any contemporaneous records, and destroyed records. Estate funds were spent on work that could not be accounted for, for work that was overcharged, and for equipment and furniture that was kept by Kathy and her husband.

Kathy also argues that the trial court erred in finding that she breached her fiduciary duty with regard to bonds, firearms, and property distributions. Kathy sold the firearms for $4,200 without supporting records or tracking what happened with the proceeds. She also failed to keep records to support her claims of how some of the bonds were spent and account for at least $44,000. She charged the estate for withdrawals that were made from Arla's account prior to her death. She improperly credited Annette with unsupported preliminary

25

distribution amounts totaling $19,657. She gave away estate assets, the coins, without a proper inventory or valuation assessment. Kathy also admitted using estate funds to pay off her personal lines of credit without any reasonable explanation.

Kathy's claim that the trial court based its findings on her not being "perfect" in hindsight is not supported in the record. Overwhelming evidence supported the trial court's finding.

Damages

Kathy contends that the trial court erred in entering judgment against her and her marital estate.[6]

If the trial court finds that Kathy, as personal representative, has breached her fiduciary duty, has exceeded her authority, has abused her discretion in exercising a power, has otherwise failed to execute the trust faithfully, has violated a statute or common law affecting the estate, or is subject to removal, then the court

> may order such remedy in law or in equity as it deems appropriate. The remedy may include, but not be limited to, awarding money damages, surcharging the personal representative, directing the personal representative to take a specific action, restricting the

---

[6] Kathy does not make the argument that the trial court did not have the authority to award damages against her marital estate as distinct from her in her own capacity. Thus, that issue is not before us in this appeal. See Clark County. v. Western Washington Growth Mgmt. Hearings Rev. Bd., 177 Wn.2d 136, 144, 298 P.3d 704 (2013) ("The scope of a given appeal is determined by the notice of appeal, the assignments of error, and the substantive argumentation of the parties.").

powers of the personal representative, removing the personal representative and appointing a successor, and awarding fees and costs under RCW 11.96A.150.

RCW 11.68.070.

Kathy claims that Mary never presented evidence to prove damages. Kathy ignores the trial court's ability to award damages in law or in equity. The trial court explained its basis for awarding damages, specifically highlighting (1) the $200,868.46 in estimated loss net profit which allowed Kathy to claim $280,386.02 in renovation costs; (2) the $19,657 in preliminary distributions charged to Annette; (3) the $44,000 unaccounted for savings bonds; (4) the missing $4,200 proceeds from the sale of the gun collection; and (5) the $40,000 in general damages "for Respondent's inflated and unsubstantiated charges for renovations, and other miscellaneous Estate assets that she failed to properly marshal, inventory, and sell."

We need not repeat our previous discussions about the substantial evidence that supports damages (1)-(4). Further, the record supports the $40,000 in general damages from charges Kathy made to the estate that the court did not find credible. For example, the court did not find credible, based on substantial evidence in the record, Kathy's claim of $13,495 for staging fees. The court pointed out several other charges that were not substantiated or were contradicted. These include:

- 196 trips at $25 a trip for a total of $4,900 for Kathy to secure the house after viewings when the house was listed, when Kathy admitted she did not do all of these trips.

- 16 hours at $35 to pressure wash the garage for a total of $560 where witness testimony established the task should have taken one hour.

- 40 hours at $35 an hour for a total of $1,400 to try and remove paint splatter from the floor before realizing the floors had to be sanded.

- $381.29 for a Home Depot purchase after the sale of the house with no explanation.

- $439 for the paint sprayer that was kept by Kathy's husband.

- $19,204.36 for mold remediation without any estimate for what a professional company would have charged for the work. Pumma credibly testified that he did not see any mold in the house, in August of 2017, and that the mold that could be seen in the photographs provided by Kathy suggested it could be taken care of relatively inexpensively.

Kathy also insists that "no qualified witness testified that the work or the rates charged by Kathy and her family [were] unreasonable." Though the trial court questioned the hourly wages that were charged, the basis for damages was sufficiently supported by evidence of paying for renovations that either were not needed or work claimed to have been performed that was not performed. Instead of providing contemporaneous records and receipts, much of the evidence Kathy relied on was her own testimony, which the trial court found not credible.

Kathy provides no authority to support her argument that because Mary did not present contrary estimates of costs, the court was required to accept

Kathy's testimony. Nothing required the trial court as fact finder to believe Kathy's testimony. "[J]udges do not leave their common experience and common sense outside the courtroom door." In re Est. of Hayes, 185 Wn. App. 567, 598, 342 P.3d 1161 (2015).

Kathy has not established that the trial court erred in entering its judgment.

Entitlement to Damages

Kathy next claims that the trial court erred by disinheriting her from her mother's estate in its judgment.

The trial court's order awarded damages to the estate, Mary, and Annette, jointly and severally in the amount of $308,725.46 "of which Respondent shall receive no share as part of her inheritance."

Kathy relies on Matter of Est. of Rathbone, 190 Wn.2d 332, 412 P.3d 1283 (2018), for the proposition that a trial court is prohibited from changing the terms of a decedent's will, even in cases of misconduct. Rathbone concerned the interpretation of a will where the trial court erred by finding it had authority under RCW 11.68.070. Rathbone, 190 Wn.2d at 343-44. Rathbone did not concern the removal of the personal representative. Id. at 344. The Rathbone court recognized that though RCW 11.68.070 does not provide a remedy of will construction, it could provide a court with some authority to intervene to ensure a personal representative complies with his or her fiduciary duties. Id. at 343. That

is exactly what occurred in the instant case.

RCW 11.68.070 applies in this case because Mary petitioned to remove Kathy as personal representative. The trial court granted that request, which Kathy does not challenge. The court was acting within its authority under RCW 11.68.070(2) to prohibit Kathy from benefitting from the damages that she caused as an equitable remedy.

## Attorney Fees

Kathy argues that the trial court erred by entering an award of attorneys' fees to Mary. She also contends that the trial court erred in restraining her from paying her attorneys' fees with estate funds. We disagree.

RCW 11.68.070(2) permits a trial court to restrict the powers of a personal representative and award attorneys' fees and costs where the court finds that a personal representative has breached a fiduciary duty. The court found that Kathy breached her fiduciary duties and therefore had the authority to restrict her powers to use estate money to pay her attorneys' fees while also awarding attorneys' fees and costs to Mary, Annette and Arla's estate.

Both parties request attorneys' fees on appeal. Mary requests attorneys'

fees and costs on appeal under to RAP 18.1(a) and RCW 11.96A.150.[7] We grant Mary's request for attorneys' fees and costs, which are to be paid by Kathy personally.

CONCLUSION

We affirm and order Kathy to pay attorneys' fees to Mary in an amount to be determined by a commissioner of this court.

Coburn, J.

WE CONCUR:

Chung, J.

Verellen J. P.T.

---

[7] RCW 11.96A.150 provides that either the superior court or any court on an appeal may, in its discretion, order costs, including reasonable attorneys' fees, to be awarded to any party: (a) From any party to the proceedings; (b) from the assets of the estate or trust involved in the proceedings; or (c) from any nonprobate asset that is the subject of the proceedings. The court may order the costs, including reasonable attorneys' fees, to be paid in such amount and in such manner as the court determines to be equitable. In exercising its discretion under this section, the court may consider any and all factors that it deems to be relevant and appropriate, which factors may but need not include whether the litigation benefits the estate or trust involved.